# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JANUARY 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0324-MR

BRUCE WAYNE EMBRY                                     APPELLANT

|  | ON APPEAL FROM MUHLENBERG CIRCUIT COURT |
|---|---|
| V. | HONORABLE BRIAN WIGGINS, JUDGE |
|  | NO. 21-CR-00192 |

COMMONWEALTH OF KENTUCKY                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Muhlenberg County jury convicted Bruce Wayne Embry of one count each of trafficking in a controlled substance, heroin, while in possession of a firearm; trafficking in a controlled substance, methamphetamine, while in possession of a firearm; possession of a firearm by a convicted felon; and being a persistent felony offender (PFO) in the first degree. Embry received a total enhanced sentence of seventy years in prison. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Muhlenberg Circuit Court.

## I. BACKGROUND

Embry drove from his home in Muhlenberg County to Louisville the night of May 26, 2021, accompanied by Chrystal Johnson. At trial, Johnson testified that she had known Embry for roughly one year. Johnson further testified that

when the two arrived in Louisville, Embry drove to the home of his family members, went inside, and returned carrying six or eight ounces of methamphetamine. After obtaining the methamphetamine, Embry was said to have driven back to Muhlenberg County with Johnson where they went to Embry's garage at 89 Spring Street in Central City. Johnson had visited the garage with Embry on multiple occasions and testified the two were engaged in a sexual relationship. She also testified she had often seen Embry in possession of drugs and that he stored drugs in the garage. Johnson testified that, upon arriving at the garage in the early morning hours of May 27, 2021, Embry went inside while she stayed in the car. Johnson testified Embry took the methamphetamine into the garage and did not have the methamphetamine when he returned to the car. Embry's friend James "Ponch" Jones resided in a camper on the same property as the garage.

Prior to Embry's trip to Louisville in May 2021, Detective Troy Gibson of the Pennyrile Narcotics Task Force was investigating Embry for involvement in drug trafficking. Detective Gibson was also familiar with Johnson because she had served as a confidential informant to local authorities on past occasions. On May 28, 2021, Detective Gibson and officers from the Division of Probation and Parole took Johnson into custody at a local Dollar General store. At the time, Johnson was a convicted felon in violation of her parole conditions. Detective Gibson told Johnson that he was investigating Embry for drug trafficking, solicited Johnson's help, and offered to put in a good word for her with the corrections system. Johnson subsequently gave Detective Gibson a

2

recorded statement detailing her trip to Louisville with Embry and stated that she had been buying "dope" from Embry for roughly one year and that Embry often kept drugs in his garage.

Detective Gibson applied for a warrant to search Embry's garage at 89 Spring Street the same day he spoke with Chrystal Johnson. A warrant was quickly issued, and officers arrived at Embry's garage the same evening. Upon gaining entry to the garage, officers observed Embry sitting on a couch joined by his daughter. Officers searched the garage and found a bag containing a white crystalline substance in a filing cabinet, two handguns stuffed between the couch cushions where Embry had been sitting, and $3,255 in Embry's wallet. Embry was then transported to the local jail.

At the jail, Embry was instructed to remove his clothes while the jail employees searched his clothing for contraband. At trial, Deputy Matthew Marshall testified a pill fell out of Embry's shoe during the procedure. He further testified two bags were discovered in Embry's pants. The bags were later determined to contain a mixture of heroin, methamphetamine, fentanyl, tramadol, and gabapentin. One bag weighed 0.549 grams and the other 2.3 grams. Deputy Marshall testified that Embry accused him of planting the bags in Embry's pants. Deputy Marshall testified that he then asked Embry to engage in a "squat and cough," so he could determine whether Embry was concealing any items in his buttocks. Deputy Marshall testified he eventually recovered another bag wrapped in a paper towel from in between Embry's

buttocks. The bag was later determined to contain 27.76 grams of methamphetamine.

At trial Embry testified that shortly before he was arrested at his garage, his friend Ponch gave him the bags to hold and Embry stuffed them down his pants. He testified it was his intent to give the bags back to Ponch. Embry also testified that Ponch often occupied the garage, and Embry was not aware of the guns concealed in the couch. Detective Gibson testified that the composition of the bags found on Embry's person, as well as the large amount of cash in his wallet, indicated that Embry had intended to traffic the drugs in his possession.

At the close of the Commonwealth's case, Embry moved for a directed verdict on the trafficking charges. The motion was denied. The jury later convicted Embry of both counts of trafficking and possession of a handgun by a convicted felon. However, the trial court declared a mistrial during the penalty phase, and a second jury trial was held in June 2022 to recommend Embry's sentence. The jury found that Embry was a PFO and recommended 50 years' imprisonment on each trafficking charge and 20 years on the possession of a handgun by a convicted felon charge, to run consecutively and capped at a total of 70 years.

We will set out additional facts as relevant.

## II. ANALYSIS

Embry alleges numerous errors by the trial court and urges this Court to reverse his convictions. First, he alleges that the trial court erred in denying his

4

motion for a directed verdict on the charge of trafficking in heroin. Second, he alleges the jury instructions on the trafficking charges violated his right to a unanimous verdict. Third, he alleges the trial court erroneously admitted a host of other bad act evidence in violation of Kentucky Rule of Evidence (KRE) 404(b). Fourth, he alleges the trial court erroneously failed to suppress the fruits of a search which was conducted based on an allegedly insufficient search warrant affidavit. Fifth, he alleges the trial court erroneously admitted evidence which improperly bolstered the credibility of one of the Commonwealth's witnesses. Sixth, he alleges the Commonwealth failed to prove by competent evidence that he was a convicted felon in order to sustain the conviction for possession of a firearm by a convicted felon. Finally, he urges this Court to reverse his convictions due to cumulative error. We address each of Embry's arguments in turn.

## A. Directed Verdict

Embry first argues that the trial court erred in denying his motion for a directed verdict on the charge of trafficking in heroin. He asserts that no reasonable juror could find beyond a reasonable doubt that he possessed heroin with the intent to sell it. Specifically, he contests an intent to sell heroin because the bags of drugs at issue contained a mixture of five different drugs, only one of which was heroin. This issue was properly preserved.

Our directed verdict standard has been firmly established in *Commonwealth v. Benham*:

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the

5

Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky. 1991). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020). "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Benham*, 816 S.W.3d at 187.

Pursuant to KRS 218A.1412(1)(d), "[a] person is guilty of trafficking in a controlled substance in the first degree when he or she knowingly and unlawfully traffics in . . . [a]ny quantity of heroin . . . ." "'Traffic' . . . means to . . . possess with intent to manufacture, distribute, dispense, or sell a controlled substance[.]" KRS 218A.010(56). "'Heroin' means a substance containing any quantity of heroin, or any of its salts, isomers, or salts of isomers[.]" KRS 218A.010(20).

In this case, the jury heard that Embry was arrested and brought to the jail. He was searched at the jail, and a bag, containing two smaller bags, fell out of his pants. One of those smaller bags weighed 0.549 grams and the other weighed 2.3 grams. Both smaller bags contained a mixture of heroin, fentanyl, methamphetamine, tramadol, and gabapentin. The specific quantity of each

6

drug in the mixture was unknown. Embry himself testified that he was "holding" the bags for his friend and suspected that they contained drugs.

The jury also heard Detective Troy Gibson from the Pennyrile Drug Task Force testify that possession by a person of more than one bag of the same drug is indicative of trafficking as opposed to personal use. He testified this is especially true if the weights of the bags are consistent with an amount of the drug that is typically purchased on the street. Here, one of the bags contained just over a half gram of heroin, and Detective Gibson testified that heroin is sometimes trafficked in half gram bags. Detective Gibson also testified that the combination of Embry's possession of close to three (3) grams of heroin, the multiple bags, and the large amount of cash found in Embry's wallet all indicated trafficking.

Additionally, Deputy Beatty testified that Embry's possession of two bags containing different amounts of the same drugs was indicative of trafficking. Finally, the jury heard from Johnson that just a couple of days before his arrest, Embry was in possession of several hundreds of dollars' worth of heroin.

Taking all of this evidence into consideration, it would not be clearly unreasonable for a jury to find Embry guilty of trafficking in heroin. Embry points this Court to other pieces of evidence that might mitigate against his guilt, such as Detective Gibson's testimony, contrary to Deputy Beatty's, that multiple bags containing *similar* amounts of the same drugs is indicative of trafficking. Embry also emphasizes the fact that the bags contained a mixture

7

of five different drugs. He notes that none of the Commonwealth's witnesses testified about the significance of that fact in their analyses of whether the items Embry possessed were indicative of trafficking. He further argues that the very fact that the bags contained a mixture of drugs creates reasonable doubt that Embry intended to sell heroin, specifically.

Although Embry points out evidence that was, perhaps, favorable to him, the trial court was required to draw all inferences in favor of the Commonwealth in making its decision on a motion for a directed verdict. *Benham*, 816 S.W.2d at 187. We are also mindful that "[i]ntent can be inferred from the actions of an accused and the surrounding circumstances. The jury has wide latitude in inferring intent from the evidence." *Anastasi v. Commonwealth*, 754 S.W.2d 860, 862 (Ky. 1988) (citing *Rayburn v. Commonwealth*, 476 S.W.2d 187 (Ky. 1972)). Reviewing the evidence as a whole, we conclude that it would not be clearly unreasonable for a jury to find guilt. *Benham*, 816 S.W.2d at 187. Accordingly, the trial court did not err in denying Embry's motion for a directed verdict.

## B. Unanimous Verdict

Embry next argues that the jury instructions on the trafficking charges violated his right to a unanimous verdict. He concedes this argument is not preserved and requests palpable error review pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26. ("A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and

8

appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.")

As discussed above, Embry was found in actual or constructive possession of four (4) bags containing drugs. The first bag was found in the filing cabinet in the residence, weighed 2.737 grams, and contained methamphetamine. The second bag was found by jail staff hidden in his buttocks, weighed 27.76 grams, and contained methamphetamine. The third bag was found at the jail when it fell out of his pants, weighed 2.3 grams, and contained a mixture of heroin, methamphetamine, fentanyl, tramadol, and gabapentin. The fourth bag was also found at the jail when it fell out of his pants, weighed .549 grams, and contained a mixture of heroin, methamphetamine, fentanyl, tramadol, and gabapentin.

Embry asserts that the jury could have found him guilty of trafficking in methamphetamine for any of the four bags and of trafficking in heroin for either of the two bags that fell out of his pants at the jail. He further asserts that because the jury instructions did not specify which bag he possessed with intent to sell, the jury may not have unanimously agreed on which bag he possessed with this intent. He argues that because of this potential disagreement, his right to a unanimous verdict was violated. We disagree.

The trial court instructed the jury that in order to find Embry guilty of trafficking in methamphetamine, they had to believe beyond a reasonable doubt all of the following:

> A. That, in this county on or about May 28, 2021, and before the finding of the Indictment herein, he had in his possession a quantity of two (2) or more grams of methamphetamine;
> AND
> B. That he knew the substance so possessed by him was methamphetamine;
> AND
> C. That he had the methamphetamine in his possession with the intent of selling it to another person. . . .

The trial court further instructed the jury that in order to find Embry guilty of trafficking in heroin, they had to believe beyond a reasonable doubt all of the following:

> A. That, in this county on or about May 28, 2021, and before the finding of the Indictment herein, he had in his possession a quantity of heroin;
> AND
> B. That he knew the substance so possessed by him was heroin;
> AND
> C. That he had the heroin in his possession with the intention of selling it to another person. . . .

As Embry notes, the instructions did not specify which bag of drugs the jury had to believe Embry possessed with the intent to sell. However, the constitution does not require this.

Specifically, Embry argues that the instructions given to the jury in his case created a "multiple acts" violation of the unanimity requirement. This type of violation occurs when "a general jury verdict is based on an instruction including **two or more separate instances** of a criminal offense, whether explicitly stated in the instructions or based on the proof." *Martin v. Commonwealth*, 456 S.W.3d 1, 6-7 (Ky. 2015), *overruled on other grounds by Johnson v. Commonwealth*, 676 S.W.3d 405 (Ky. 2023) (emphasis added) (alteration and citation omitted). In *Martin*, we explained that when

10

the instruction does not specify which specific act it is meant to cover, we cannot be sure that the jurors were unanimous in concluding the defendant committed **a single act** satisfying the instruction. Instead, the jury's verdict only reflects their unanimous view that the defendant committed the crime, without necessarily resulting in a unanimous conclusion that the defendant committed a single criminal act beyond a reasonable doubt.

*Id.* at 7 (emphasis added).

Our multiple acts jurisprudence has focused on situations in which the defendant was alleged to have committed two distinct instances of conduct, often on two different dates, either of which could have qualified for a conviction of the charged offense. *See Kingrey v. Commonwealth*, 396 S.W.3d 824 (Ky. 2013), *overruled on other grounds by Johnson*, 676 S.W.3d 405; *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013), *overruled on other grounds by Johnson*, 676 S.W.3d 405; *Martin*, 456 S.W.3d 1; *King v. Commonwealth*, 554 S.W.3d 343 (Ky. 2018), *overruled on other grounds by Johnson*, 676 S.W.3d 405. Such is not the case here.

Here, there was only one alleged instance of criminal conduct for each count that occurred on one date. Embry was alleged to have possessed methamphetamine with the intent to sell it on May 28, 2021. He was also alleged to have possessed heroin with the intent to sell it on that same date. The facts that Embry was in possession of more than one bag of drugs and that those bags were found in different locations do not change this analysis. The drugs found on Embry at the jail were only found there rather than at the residence because the search of Embry at the jail was presumably more

11

thorough than the one conducted when he was placed under arrest at the residence. In short, our constitution's unanimity requirement does not require the level of specificity for which Embry advocates. Accordingly, Embry's right to a unanimous verdict was not violated.

**C. Other Acts Evidence**

Embry alleges the trial court committed reversible error in that it erroneously admitted the following pieces of "prior bad acts" evidence under KRE 404(b): (1) general testimony from Chrystal Johnson about Embry's prior drug activity, (2) testimony from Detective Gibson that he was investigating Embry for drug trafficking, (3) evidence that Embry had made a trip to Louisville on May 26 to obtain methamphetamine, (4) evidence regarding a pill that fell out of Embry's shoe at the jail, (5) evidence that Embry had threatened a deputy jailer at the jail, and finally (6) evidence of other drugs and paraphernalia found at his garage.

Embry failed to preserve his objection to the admission of some of this evidence, and we review those pieces of evidence for palpable error under RCr 10.26. "A palpable error is one resulting in 'manifest injustice,' i.e. a 'probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.'" *Hunt v. Commonwealth*, 326 S.W.3d 437, 440 (Ky. 2010) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006)).

Embry did, however, file a motion in limine seeking to prohibit the admission of some prior bad acts evidence the Commonwealth provided pre-

trial notice of under KRE 404(c). Those pieces of evidence include testimony from Chrystal Johnson that Embry often kept drugs on his person, evidence regarding a pill that fell out of Embry's shoe during his change-out procedure at the jail, evidence of other drugs and paraphernalia found at his garage, and evidence that Embry made a trip to Louisville on May 26 to obtain methamphetamine. In his motion in limine, Embry challenged these pieces of evidence arguing that the Commonwealth "failed to articulate [its] grounds for introduction" and any "probative value would be seriously outweighed by the prejudicial impact on the Defendant." Defense counsel also advocated to prohibit the admission of these four pieces of evidence at a pre-trial hearing and disputed their relevancy. We observe the defense's objections to these pieces of evidence were properly preserved, and we review the trial court's subsequent evidentiary rulings for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999). The Commonwealth further concedes that defense counsel's contemporaneous objection to Deputy Jailer Matthew Marshall's testimony that Embry had threatened him at the jail appropriately preserved that issue. We also review the trial court's admission of that evidence for an abuse of discretion.

Under KRE 404(b), "[e]vidence of other crimes, wrongs, or acts" is inadmissible to prove propensity and may only be admissible under two sets of circumstances:

> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

In assessing evidence admitted under KRE 404(b), this Court has maintained a three-part examination of the evidence's relevance, probativeness, and prejudice. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). First, we ask ourselves is the evidence "relevant for some purpose other than to prove the criminal disposition of the accused?" *Id.* Second, is the evidence "sufficiently probative of its commission by the accused to warrant its introduction into evidence?" *Id.* at 890. And finally, does the evidence's potential for prejudice "substantially outweigh its probative value?" *Id.*

In analyzing whether evidence of prior bad acts is relevant for "some other purpose" than propensity, this Court has upheld the admission of such evidence when relevant to prove a defendant's "intent" to commit the charged offense—that is when intent is an element of the charged offense, or when intent is genuinely in dispute. *Walker v. Commonwealth*, 52 S.W.3d 533, 535-36 (Ky. 2001) (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25, 98 (3d ed. 1993)).

14

Evidence of prior bad acts can also be relevant to prove a defendant's "knowledge" when necessary to refute a defendant's claim of lack of knowledge. *Muncy v. Commonwealth*, 132 S.W.3d 845, 847–48 (Ky. 2004). Defendants often "open the door" to the admission of this category of evidence by claiming a lack of knowledge at trial. *Id.* at 848.

KRE 404(b)(1) also allows for the admission of prior bad acts evidence relevant to prove the defendant engaged in "preparation" or employed a "plan" to accomplish the charged offense. Under this exception, the prior bad acts and the charged offenses are said to be "part and parcel of a greater endeavor." *English*, 993 S.W.2d at 945.

KRE 404(b)(1)'s list of "other purposes" for which evidence of prior bad acts may be admissible is "illustrative rather than exhaustive." *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 219 (Ky. 2003) (quoting *Colwell v. Commonwealth*, 37 S.W.3d 721, 725 (Ky. 2000)). Accordingly, this Court has previously upheld the admission of prior bad acts evidence when such evidence is relevant to prove the defendant's "consciousness of guilt." *Elam v. Commonwealth*, 500 S.W.3d 818, 824 (Ky. 2016).

Under KRE 404(b)(2), evidence of prior bad acts that are "inextricably intertwined" with other evidence in the case may also be admissible when evidence of those prior bad acts

> "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its environment that its

proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context[]."

*Ordway v. Commonwealth*, 391 S.W.3d 762, 790 (Ky. 2013) (quoting *Norton v. Commonwealth*, 890 S.W.2d 632, 638 (Ky. App. 1994)).

### i. Testimony from Chrystal Johnson about Embry's Prior Drug Activities

Embry challenges statements made by Chrystal Johnson at trial alleging that she often saw Embry in possession of methamphetamine, that Embry sometimes talked to her about selling methamphetamine, that Embry previously told her that he was looking for hundreds of dollars' worth of drugs that he had lost, that she had been buying drugs from Embry for over a year, and that Embry was known to carry drugs on his person. We begin by noting that the only one of these issues that Embry has sufficiently preserved for this Court's appellate review is Johnson's testimony that he was known to keep drugs on his person. However, because we discern no error in the admission of any of these statements, we need not scrutinize them differently.

Embry was charged with two counts of trafficking in a controlled substance, KRS 218A.1412, charges that required the jury to decide whether Embry had the intent to sell those controlled substances to others. Throughout trial, Embry relied heavily on the defense theories that he lacked the intent to sell any drugs found in his possession at the time he was arrested, that the drugs were given to him by his friend James "Ponch" Jones, and that he intended to return them. As such, it is clear that Embry's intent was "in genuine dispute." *Walker*, 52 S.W.3d at 536.

16

As to the evidence's relevancy, we hold that the above-described testimony from Chrystal Johnson that tended to show Embry had previously harbored the intent to sell drugs like methamphetamine was relevant to prove his intent as to the charges he faced at trial.

> [T]he relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense.

*Walker,* 52 S.W.3d at 537 (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)).

We further observe that, prior to trial, Embry allegedly made several statements that put his knowledge of the drugs in his possession in genuine dispute. Kentucky State Police Trooper Broadbent testified that at the scene of arrest, Embry accused Trooper Broadbent of planting the methamphetamine officers found in the garage. Deputy Marshall also testified that, during Embry's change-out at the jail, Embry accused him of planting two bags of drugs on his person. Deputy Marshall also testified that when he asked Embry about the bag of methamphetamine located between his buttocks, Embry said he did not know what the bag was and accused Deputy Marshall of planting it.

It is clear to this Court that Chrystal Johnson's testimony alleging that Embry had committed the above-described bad acts was relevant to disprove Embry's pre-trial statements that he had no knowledge of the drugs found on his person or in the garage. Chrystal Johnson's testimony about Embry's prior general drug activity tended to make it more likely that he had an intimate

17

knowledge of drugs like methamphetamine and heroin, that he would recognize them in his presence, and that he did, in fact, have knowledge they were on his person. Embry's pre-trial accusations and statements of lack of knowledge "open[ed] the door" to the admission of this evidence. *Muncy*, 132 S.W.3d at 847. We note that Embry did not acknowledge that he had suspicions of what was in the bags in his pants until he himself took the stand *after* Chrystal Johnson's sworn testimony.

This Court further concludes that each of Johnson's statements were sufficiently probative to warrant their admission into evidence. The burden of probativeness "is met by a showing that the 'jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts.'" *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997)). Here, Johnson testified that she had been buying drugs from Embry for more than a year. The only contradictory evidence regarding Johnson's knowledge of Embry's prior actions came from Embry himself, which placed the jury in the best position to determine which witness it would believe. As such, we conclude that the jury could reasonably conclude that Johnson would have sufficient knowledge about Embry's trafficking activity to render her sworn statements sufficiently probative of Embry's prior bad acts.

We finally ask whether the probative value of Johnson's testimony as to the commission of the charged offenses is "substantially outweighed by the danger of undue prejudice"—that prejudice being the "forbidden character

18

inference" that KRE 404(b) is intended to prohibit. *Jenkins v. Commonwealth*, 496 S.W.3d 435, 459 (Ky. 2016). Here, it is the rebutting force of Johnson's testimony that gives it substantial probative value. Each piece of testimony in this category was probative to disprove the defense theories that Embry lacked the intent to traffic in a controlled substance and that he had no knowledge of the drugs found in his possession. In a trial focused largely on Embry's intent and knowledge, this testimony from Johnson was highly probative.

As such, we cannot find any error in the admission of Johnson's testimony in these respects.

### ii. Testimony from Detective Gibson that he was investigating Embry for drug trafficking

Embry alleges that the trial court erred when it admitted testimony from Detective Gibson that he had been investigating Embry for drug trafficking even before Chrystal Johnson gave her recorded statement to Detective Gibson. As Embry failed to preserve this issue, we review admission of this evidence using the palpable error standard.

First, we take this opportunity to recognize that Detective Gibson's statements concerning his ongoing investigation do not particularly reference a specific bad act allegedly committed by Embry. Detective Gibson merely responded in the affirmative when asked whether he had "been investigating the defendant, Bruce Embry, for drug trafficking." At first blush, it might not be apparent that evidence of a mere "investigation" warrants exclusion under KRE 404(b), which only operates to exclude evidence of "[o]ther crimes, wrongs,

19

or acts." However, such a statement carries a necessary implication that Embry had previously committed crimes, wrongs, or bad acts of some sort as to warrant Detective Gibson's investigation. Even "thinly-veiled reference[s]" to a defendant's relationship with law enforcement can trigger KRE 404(b)'s exclusionary rule. *Wiley v. Commonwealth,* 348 S.W.3d 570, 581 (Ky. 2010). Here, it is apparent that Detective Gibson's statement, while not exceedingly particular, carried the same potential for prejudice as other evidence also rightfully excluded under KRE 404(b): an inference that Embry had a criminal character. For these reasons, we analyze Detective Gibson's testimony under KRE 404(b).

We conclude that Detective Gibson's testimony affirming the existence of his investigation into Embry's drug trafficking activities was "inextricably intertwined" with other evidence in the case and admissible to furnish the context for the eventual discovery of the charged offenses. KRE 404(b)(2). Immediately before Detective Gibson testified that he had been investigating Embry for drug trafficking, he testified that he had driven to a local Dollar General store on May 28 to speak with Chrystal Johnson, who would later give him a statement attesting to Embry's prior drug trafficking activities. Detective Gibson's confirmation that he had been investigating Embry for drug trafficking necessarily furnishes the context for why Detective Gibson desired to meet with Johnson, as well as her eventual statement to Detective Gibson. And that statement ultimately led the authorities to search Embry's garage at 89 Spring Street in Muhlenberg County, where he was arrested. Detective

20

Gibson's acknowledgement of his investigation "provided the setting and context of the discovery of the crime." *Kerr v. Commonwealth*, 400 S.W.3d 250, 263 (Ky. 2013). Excluding this evidence would have left a reasonable jury to wonder why Detective Gibson had desired to meet with Johnson at Dollar General and why he asked her whether she had been involved with Embry. Limitation of this testimony would have eliminated a material link in the logical progression of the Commonwealth's case. KRE 404(b)(2), while exclusionary in nature, does permit the Commonwealth "'to present a complete, unfragmented picture of the crime and investigation[,]' including a 'picture of the circumstances surrounding how the crime was discovered.'" *Kerr*, 400 S.W.3d at 261. Accordingly, we hold that Detective Gibson's statements regarding his investigation into Embry's alleged drug trafficking activities were relevant for some purpose other than to prove a criminal propensity.

It is also readily apparent that this evidence, coming from Detective Gibson himself—the proponent of this investigation into Embry—was sufficiently probative to lead a jury to believe that Embry was, in fact, being investigated for drug trafficking. Further, Embry offered no evidence to refute Detective Gibson's statement that Embry was being investigated.

We are also convinced Detective Gibson's mere affirmation of the existence of his investigation was not prohibitively prejudicial as to warrant exclusion of this evidence. Detective Gibson did not elaborate on any alleged prior bad acts that might have sparked his investigation into Embry. We also observe that any reasonable jury might logically conclude for itself that any

21

criminal defendant facing charges of drug trafficking was likely, at one point, under investigation for drug trafficking.

Accordingly, we discern no error, and certainly no palpable error, in the admission of Detective Gibson's brief reference to his investigation into Embry's alleged drug trafficking activities.

### iii. Evidence that Embry traveled to Louisville on May 26 to obtain methamphetamine

Embry next challenges the admission of testimony from Chrystal Johnson that Embry had traveled to Louisville on May 26, 2021, bought several ounces of methamphetamine, and returned to Muhlenberg County with that methamphetamine. We find this issue properly preserved by Embry's motion in limine and review its admission for an abuse of discretion.

We hold that Johnson's testimony as to Embry's alleged trip to Louisville was relevant to prove that Embry had engaged in "preparation" or employed a "plan" to accomplish the charged offense of trafficking in a controlled substance. KRE 404(b)(1). Here, Johnson testified that she had accompanied Embry to Louisville where he visited the home of family members, went inside that home, and returned carrying about six or eight ounces of methamphetamine. Johnson further testified that the two drove back to Muhlenberg County and stopped at Embry's garage at 89 Spring Street where Embry took the methamphetamine inside. Johnson testified that when Embry returned to the car he no longer had any methamphetamine with him. When asked whether she knew what Embry planned to do with the

22

methamphetamine he had obtained in Louisville, Johnson replied "probably use it, sell it."

It is clear to this Court that each detail of Embry's trip to Louisville that Johnson testified to can logically be viewed as a step taken in preparation for Embry's trafficking offense. To accomplish the offense of trafficking, one must necessarily gather, obtain, or produce the illicit materials he intends to traffic— precisely the sequential picture painted by Johnson's testimony. According to Johnson, Embry drove to Louisville with an intent to obtain methamphetamine, obtained that methamphetamine, drove back to Muhlenberg County with that methamphetamine, and deposited that methamphetamine in his garage while harboring an intent to later use or sell it. Each step alleged in this sequence is "part and parcel" of a greater endeavor charged by the Commonwealth—the offense of trafficking in a controlled substance. *English*, 993 S.W.2d at 945. Accordingly, Johnson's testimony is certainly relevant to prove preparation or plan under KRE 404(b)(1).

As to the probative value of this evidence to support a conclusion by the jury that Embry did, in fact, go to Louisville to obtain methamphetamine, we conclude that Johnson's first-hand testimony describing the alleged prior bad act was sufficient to support its admission. Johnson testified that she personally accompanied Embry to Louisville and that she saw him in possession of a large amount of methamphetamine. Even if not corroborated, such first-hand observations alleged by the witness were sufficient to create a

23

reasonable inference on the part of the jury that Embry did go to Louisville and returned to Muhlenberg County with methamphetamine.

We further conclude that any prejudice occasioned by Johnson's testimony concerning Embry's trip to Louisville did not substantially outweigh its probative value in proving the charged offenses. Johnson's testimony gave the jury a plausible depiction of exactly how Embry set out to accomplish the charged offense of trafficking, beginning first with obtaining the necessary materials to accomplish the crime. The existence of such a plan, and Embry's execution of that plan, certainly made it much more likely to be true that Embry accomplished the charged offense of trafficking in a controlled substance. This evidence was highly relevant to prove the commission of the charged offense.

Accordingly, we cannot say the trial court abused its discretion in admitting this evidence.

### iv. Evidence regarding the pill in Embry's shoe discovered at the jail

Embry next challenges the admission of testimony from Deputy Marshall and Captain Horton concerning a pill discovered in Embry's shoe during his change-out procedure at the jail. As Embry's motion in limine preserved this issue for review, we review for an abuse of discretion.

At trial, Deputy Marshall testified that, while being changed out, Embry removed his shoe, and a loose pill fell to the floor. Deputy Marshall also testified that Embry explained the presence of the pill by stating that it was

24

"his medication." Deputy Marshall testified that multiple bags of drugs were later found within Embry's clothes, as well as one bag located between his buttocks, discovered during a "squat and cough" procedure. Deputy Marshall testified that inmates are asked to squat and cough if they are "considered to have anything on them." He also testified that the purpose of the squat and cough is "to make sure they do not have anything hidden . . . ." The bag discovered between Embry's buttocks later formed part of the basis for the Commonwealth's trafficking in a controlled substance, methamphetamine charge.

Captain Horton testified that he assumed custody of each of the items found on Embry's person during his change-out procedure before transferring them to another deputy, including the pill found in Embry's shoe, the bags in his pants, and the bag discovered during the squat and cough procedure.

We conclude that the trial court did not abuse its discretion in admitting the brief testimony regarding the pill that fell from Embry's shoe, because this evidence was inextricably intertwined with other evidence relevant to Embry's trafficking charges and furnished the necessary context for how that evidence was discovered. The testimony in question established that the pill that fell from Embry's shoe invited a reasonable inference from Deputy Marshall that Embry might have other items of interest on his person. Deputy Marshall's testimony reveals this suspicion induced him to require Embry to squat and cough, which led to the discovery of the bag located between his buttocks. As previously stated, the Commonwealth is entitled to admit evidence which

25

"provide[s] the setting and context of the discovery of the crime." *Kerr,* 400 S.W.3d at 263.

This evidence, consisting of alleged first-hand observations of the testifying witnesses, was certainly probative enough to create a reasonable inference on the part of the jury that Embry was in possession of the pill in question. Even Embry himself did not dispute the existence of the pill, only its substance.

We also cannot say that any prejudice occasioned by this evidence substantially outweighed its probative value as to the charged offenses. Again, this evidence established a logical link in the discovery of other evidence that formed part of the basis for one of the Commonwealth's trafficking charges. Deputy Marshall and Captain Horton also did not testify as to the chemical identity of the pill, nor did they dispute Embry's claim that it was "medication." This evidence simply acted to furnish the context for how other evidence highly relevant to the charged trafficking offenses was obtained.

Accordingly, we cannot say the trial court abused its discretion in admitting this evidence.

### v.    Evidence that Embry threatened Deputy Marshall at the jail

Embry next challenges admission of testimony from Deputy Marshall that Embry threatened him during the change-out procedure by stating: "I know who you are, and I know where you live." Embry properly preserved this issue via contemporaneous objection at trial, and we review for an abuse of discretion.

26

As previously stated, this Court has held that evidence of a defendant's prior bad acts may be relevant and admissible where that evidence tends to prove the defendant's "consciousness of guilt." *Elam*, 500 S.W.3d at 824. "Any attempt to suppress a witness' testimony by the accused, whether by persuasion, bribery, or **threat**, or to induce a witness not to appear at the trial or to swear falsely, or to interfere with the processes of the court is evidence tending to show guilt." *Foley v. Commonwealth*, 942 S.W.2d 876, 887 (Ky. 1997) (emphasis added) (citing *Collier v. Commonwealth*, 339 S.W. 2d 167 (Ky. 1960)).

Here, we conclude that Embry's alleged statement to Deputy Marshall can properly be characterized as a threat or intimidation and is certainly evidence of consciousness of guilt. Such a statement is plainly "inconsistent with [defendant's] innocence" and relevant for some other purpose than propensity. *Id.*

We also conclude that Deputy Marshall's descriptions of a conversation he personally had with Embry were sufficiently probative to prove that such an occasion did occur.

We finally conclude that any prejudice occasioned by the admission of this evidence was not sufficiently prejudicial to outweigh its probative value as to the charged offenses. This statement was but a small piece of evidence offered against Embry in a trial largely focused on his intent and knowledge. Embry's alleged threat was highly relevant to prove his consciousness of guilt.

Accordingly, we cannot say the trial court abused its discretion in admitting this evidence.

### vi. Evidence of drugs and paraphernalia found at Embry's garage

Embry finally challenges the admission of evidence regarding drugs and paraphernalia found in his garage during his arrest, namely an item containing THC discovered in a filing cabinet, a tin can with "white residue," and baggies. Objection to this evidence was properly preserved by Embry's motion in limine, and we review for an abuse of discretion on the part of the trial court.

During cross-examination of Detective Gibson, the following exchange occurred involving defense counsel:

> **Defense Counsel**: You've indicated that there weren't any scales that were found. Were there any separate baggies?
>
> **Detective Gibson:** I believe there were baggies found in the residence.

Minutes later, this exchange followed:

> **Defense Counsel**: Were there any items there, like pipes, or anything that would be used to ingest drugs?
>
> **Detective Gibson**: I do remember sitting in the same room there was a tin can that had white residue on top of it. How many other paraphernalia items were there, I don't remember. But I do remember a can with white residue on it.

Defense counsel then embarked on a line of questioning concerning a paraphernalia charge that had initially been brought against Embry but subsequently dropped. We cannot say with certainty *why* defense counsel thought it prudent to elicit such testimony from Detective Gibson, but after

28

review of the record we presume defense counsel sought to use the evidence of paraphernalia and the dismissed charge to his advantage to bolster the defense theory that Embry lacked an intent to traffic.

Following his question about the presence of "baggies" in Embry's garage, defense counsel asked Detective Gibson whether those baggies were "corner bags." When Detective Gibson replied that he did not remember seeing any corner bags, defense counsel asked whether the presence of corner bags was indicative of trafficking. Presumably defense counsel was attempting to highlight that the baggies found at Embry's garage were not of the kind usually associated with trafficking activity.

We also note that defense counsel specifically asked Detective Gibson whether Embry's garage contained any paraphernalia items "used to ingest drugs." Defense counsel then asked Detective Gibson to clarify which items served as the basis for Embry's dismissed paraphernalia charge. Detective Gibson stated that it was probably the tin can with white residue. We can only assume these questions were designed to invoke an inference that Embry lacked an intent to traffic the methamphetamine in his garage, and instead only use it.

"Generally, '[o]ne who asks questions which call for an answer has waived any objection to the answer if it is responsive.'" *Shemwell v. Commonwealth*, 294 S.W.3d 430, 436 (Ky. 2009) (quoting *Estep v. Commonwealth*, 663 S.W.2d 213, 216 (Ky. 1984)). Here, Detective Gibson's remarks regarding paraphernalia and other evidence discovered in Embry's

29

garage were clearly responsive to defense counsel's invitations for such testimony.

Accordingly, we conclude Embry is precluded from raising a successful challenge to the admission of this testimony.

Embry also challenges the admission of a portion of Exhibit 2, a report from the Commonwealth's lab analyst, Wendy Williams. Embry challenges the portion of the report that shows that item 1.2, which was discovered in his garage, contained 0.298 grams of THC, a chemical constituent of marijuana. We agree that this evidence had no relevant purpose other than propensity, and, as such, was inadmissible at trial.

The THC present in item 1.2 did not serve as a basis for any of the Commonwealth's charged offenses, and this evidence was not so inextricably intertwined with other relevant evidence as to warrant admission. We observe that this portion of Exhibit 2 could have been easily redacted before its introduction into evidence without "serious adverse effect" on the Commonwealth. KRE 404(b)(2). Nor did this evidence furnish appropriate context for any other evidence relevant to the offenses charged against Embry. Admission of this portion of the report was certainly error. However, when viewed against all other admissible evidence offered against Embry, we can say with fair assurance that this lone piece of evidence could not have "substantially swayed" the jury. *Ordway v. Commonwealth,* 391 S.W.3d 762, 774 (Ky. 2013). Accordingly, the erroneous admission of this evidence was harmless, and we do not reverse Embry's convictions because of it.

30

**D. Search Warrant**

Embry next argues that the trial court erred in denying his motion to suppress the fruits of the search of the building located at 89 Spring Street in Central City, Kentucky. He argues that the affidavit included in the application for the search warrant failed to provide probable cause to justify the issuance of the warrant. Specifically, he argues that the information in the affidavit was stale, irrelevant, uncorroborated, and unreliable. Embry preserved this issue through his pretrial motion to suppress.

In reviewing the issuance of a search warrant, we "look at the 'totality of the circumstances' surrounding the warrant request." *Commonwealth v. Pride*, 302 S.W.3d 43, 48 (Ky. 2010). We have previously explained that

> [t]he task of the [warrant-issuing judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[T]he trial court judge faced with a motion to suppress evidence obtained pursuant to a search warrant should . . . determine whether under the 'totality of the circumstances' presented within the four corners of the affidavit, a warrant-issuing judge had a substantial basis for concluding that probable cause existed." *Id.* at 49. On appellate review, we must "determine first if the facts found by the trial judge are supported by substantial evidence." *Id.* (citation omitted). Then, we must "determine whether the trial judge correctly determined that the issuing judge did or did not have a 'substantial basis for . . . conclud[ing]' that probable

cause existed." *Id.* (quoting *Gates*, 462 U.S. at 236). In doing so, we "review the four corners of the affidavit and not extrinsic evidence in analyzing the warrant-issuing judge's conclusion." *Id.* (citing *Commonwealth v. Hubble,* 730 S.W.2d 532 (Ky. App. 1987)). Finally, "all reviewing courts must give great deference to the warrant-issuing judge's decision." *Id.* (footnote omitted) (citing *Gates*, 462 U.S. at 236).

After reviewing the search warrant affidavit, the suppression hearing, and the trial court's order, we conclude that the trial court's factual findings were supported by substantial evidence. In doing so, we note that "[o]rdinarily . . . there is no reason for an evidentiary hearing to determine whether the facts alleged in the affidavit are actually true" unless there is an allegation that police officers "included intentionally or recklessly false statements or purposefully or recklessly omitted material facts." *Id.* at 49 n.1. No such allegation was made in this case.

We also conclude that the trial court correctly determined that the warrant-issuing judge had a substantial basis for concluding there was probable cause. Under the totality of the circumstances, while giving great deference to the warrant-issuing judge's decision, there was sufficient information in the affidavit to establish probable cause to support the issuance of the search warrant. The search warrant affidavit stated as follows:

> Affiant has been an officer in the [Pennyrile Narcotics Task Force] for a period of 8 years and 11 months. The information and observations contained herein were received and made in his/her capacity as an officer thereof. On May 28, 2021, at approximately 2:00 p.m., Affiant received information from/observed:

32

That the Affiant states that he has been investigating illegal drug activities in Muhlenberg County, Kentucky, in the performance of his duties as a Detective with the Pennyrile Narcotics Task Force. On the above-said date, the Affiant was given an audio statement by a Confidential Informant that she and Bruce Embry AKA "Batman" had traveled to Louisville on the evening of May 26, 2021 and returned to Muhlenberg County early on the morning of May 27, 2021 with approximately 8 ounces of methamphetamine. The CI advised when she and Bruce Embry arrived back to Muhlenberg County that he went inside a building/residence located at 89 Spring Street, Central City, Kentucky (which is the residence to be searched). The CI stated to the Affiant that Bruce Embry stated to her that he had approximately $700-$800 worth of heroin. The CI further stated that she had been buying dope from Bruce Embry for approximately a year and knew that the said Bruce Embry kept his dope in the safe and filing cabinet and money in a safe located inside the building/residence. The CI has provided the Affiant with a copy of text messages between her and Bruce Embry in which they discuss drugs and that he is in his garage (picture attached herewith as Exhibit A and incorporated herein). On April 3, 2021, Lisa Baker was arrested for Possession of Controlled Substance In the First Degree and Possession of Drug Paraphernalia with Bruce Embry being the driver of the vehicle. The Affiant has also received information from another CI that Bruce Embry was staying at the above-said building/residence and was known to be selling heroin and kept dope in a safe and filing cabinet located inside.

Acting on the information received, Affiant conducted the following independent investigation:

The Affiant is also aware that the said Bruce Embry has a history of numerous past drug charges. The Affiant also received a statement from Chasity Warner in December 2020 in which she states that she was also purchasing and selling dope for the said Bruce Embry. Based on the Affiant's prior experience, knowledge, training, expertise, surveillance and the foregoing, it is the Affiant's belief that methamphetamine, heroin and/or any controlled substances, any instrumentalities, paraphernalia, or other contraband associated therewith are now located at the above described property located at 89 Spring Street, Central City, Kentucky.

The text messages described in the affidavit were dated May 12 and stated:

33

Bat I need you bae
I've got u 3 so far but I want to get me some ts whenever ol girl messages me bck .. I just need
To talk to u forreal I'm in dboro atm can u call me right quick
please

Hey I'm at your garage now I'll be out there soon where you

The first message appears to be from the possessor of the phone (presumably the CI), and the second message appears to have been received by the CI in response to the first message.

This affidavit explains that Detective Gibson received information from a confidential informant (CI) that less than 48 hours earlier, the CI had gone to Louisville from Muhlenberg County with Embry. The pair had returned only the day prior with approximately eight (8) ounces of methamphetamine and went to the residence for which Detective Gibson was requesting the search warrant. Embry had also told the CI that he had between $700 and $800 worth of heroin. This information was all very recent. The CI also stated that she had been buying drugs from Embry for over a year and that she knew he stored his drugs and money in a safe and a filing cabinet located inside the residence that Detective Gibson sought to search. This information provided context for the relationship between the CI and Embry which added to the reliability of the information. Finally, the CI provided text messages which she alleged were between she and Embry. She stated, and Detective Gibson apparently believed, that the messages were about drugs.

Aside from information from the primary CI, the affidavit also contained information from, or about, three other individuals—two of whom were named

34

and one of whom was also a confidential informant—which served to corroborate portions of the primary CI's statement. First, the affidavit stated that Embry was driving a car in which Lisa Baker was a passenger when Baker was arrested for drug charges. This occurred on April 3, 2021. While this information does little on its own to inculpate Embry, it occurred relatively close in time to the application for the search warrant and placed Embry at least in the vicinity of drugs.

The affidavit also included information from Chasity Warner dating back to December 2020. At that time, Warner stated that she had been purchasing and selling drugs for Embry. While this information was from several months prior to the warrant affidavit, it corroborated the primary CI's statement which indicated that Embry had been selling drugs for at least a year prior.

Perhaps the most probative corroborating information contained in the warrant affidavit came from another CI. That CI stated that Embry was staying at the residence at issue, was known to be selling heroin, and kept his drugs in a safe and filing cabinet located inside of the residence. Although this information included neither a time frame nor additional information about the CI, it was very similar to that provided by the primary CI.

All of this information, taken together and with the fact that Embry had a history of prior drug charges, was more than sufficient to support the warrant-issuing judge's decision that there was probable cause to issue the search warrant. The information provided was not perfect and omitted statements regarding the historical reliability of the CIs and the basis of some of their

35

knowledge. However, perfect information is not required. We view the warrant-issuing judge's decision under the totality of the circumstance and give great deference to that judge. Under this standard, the warrant-issuing judge certainly had a substantial basis for his decision. Accordingly, the trial court did not err in refusing to suppress the fruits of the search of the residence conducted pursuant to the search warrant.

**E. Bolstering**

    i.      **Admission of Chrystal Johnson's prior recorded statement to Detective Gibson**

Embry now argues the trial court committed reversible error when it admitted video evidence of a prior recorded statement that Chrystal Johnson gave to Detective Gibson. Prior to trial, Chrystal Johnson gave a recorded statement to Detective Gibson detailing her trip to Louisville with Embry on May 26. In that recorded statement, when asked by Detective Gibson whether Embry had obtained eight ounces of methamphetamine in Louisville, Johnson replied affirmatively. At trial, the Commonwealth questioned Johnson about her trip to Louisville with Embry, and she stated on direct examination that she thought Embry obtained "about six ounces" of methamphetamine in Louisville. This statement was obviously inconsistent with her prior statement to Detective Gibson. When asked by the Commonwealth if she had previously told Detective Gibson that Embry had obtained eight ounces of methamphetamine, Johnson replied: "I think so. I know it was like six or eight. I couldn't be for sure." Later on cross-examination when asked again about her

36

earlier statement to Detective Gibson, Johnson replied she thought "it was either six or eight" ounces of methamphetamine. Accordingly, on re-direct, the Commonwealth sought to introduce Johnson's prior recorded statement to Detective Gibson into evidence. At the corresponding bench conference, defense counsel argued that introduction of Johnson's prior recorded statement would amount to impermissible "bolstering" of Johnson's trial testimony. The Commonwealth argued that the prior recorded statement was admissible under KRE 801A(a)(2), which excepts from the rule barring hearsay prior statements that are: "[c]onsistent with the declarant's testimony and [are] offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]" The trial court permitted the Commonwealth to play the *entirety* of Johnson's six-minute recorded statement to Detective Gibson, presumably in agreement with the Commonwealth's assertion that admission was proper under KRE 801A(a)(2). We note that defense counsel advocated that if any portion of Johnson's recorded statement was admitted, the Commonwealth should admit the entire video recording.

On appeal, Embry argues to this Court that Johnson's prior recorded statement was inadmissible hearsay and that its admission was improper under KRE 801A(a)(2) because defense counsel never lodged an express or implied charge of recent fabrication or improper influence or motive against Johnson. On appeal, the Commonwealth makes an alternative argument to the one it offered to the trial court. The Commonwealth now asserts Johnson's prior recorded statement was admissible as non-hearsay offered only for

37

rehabilitative purposes. In short, we do not wholly agree with either of the parties' arguments. Instead, we conclude the statement is more appropriately labeled as hearsay, but, nevertheless, admissible under KRE 801A(a)(1) as a statement "inconsistent" with Johnson's trial testimony.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). Under KRE 801A(a)(2), a statement that would otherwise be inadmissible hearsay can be admissible if it is "[c]onsistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]" "The hearsay exception in KRE 801A(a)(2) is only available if the prior consistent statement was made 'before the alleged motive to fabricate came into existence.'" *Hoff v. Commonwealth*, 394 S.W.3d 368, 380 (Ky. 2011) (quoting *Slaven v. Commonwealth*, 962 S.W.2d 845, 858 (Ky. 1997)). A prior statement can also be admissible when such a statement does not fall under the hearsay rule—that is when it is not being offered for the truth of the matter asserted. Such an occasion arises when prior consistent statements are "offered primarily for rehabilitative, not substantive, purposes." *Noel v. Commonwealth*, 76 S.W.3d 923, 929 (Ky. 2002). However, neither of these rules applies sensibly to the facts at hand.

Here, we discern no express or implied charge of *recent* fabrication or improper influence or motive from defense counsel aimed at Johnson. On

38

cross-examination, the following exchange occurred between defense counsel and Johnson.

> **Defense Counsel**: You stated earlier you believe he had about eight ounces, correct?
>
> **Chrystal Johnson**: Yes.
>
> **Defense Counsel**: Today, you're saying maybe six ounces?
>
> **Chrystal Johnson**: It was either six or eight.

One theory of defense was that Johnson had a motive to fabricate her initial statement to Detective Gibson in exchange for his help in resolving a probation violation. At no point did defense counsel assert that Johnson had developed a *new* motive to fabricate her trial testimony, meaning that Johnson's statement to Detective Gibson did not pre-date her supposed motive to lie. If we were to accept the defense's theory as true, it would mean only that Johnson had maintained the *same* motive to lie since her May 28 statement to Detective Gibson. Accordingly, Johnson's prior recorded statement was not admissible under KRE 801A(a)(2), because it could not have been offered "to rebut an express or implied charge against the declarant of *recent* fabrication or improper influence or motive[.]" KRE 801A(a)(2) (emphasis added). We also take this opportunity to note that Johnson's prior recorded statement also cannot be excepted under KRE 801A(a)(2)'s plain language, because her statement was plainly *inconsistent* with her trial testimony. We will discuss that inconsistency at greater length below.

We next turn to the Commonwealth's assertion on appeal that Johnson's prior recorded statement was admissible to "rehabilitate" her credibility and

therefore, not barred by the hearsay rule. The nature of rehabilitation assumes that the prior consistent statement being offered for rehabilitative purposes will tend to combat the inference that the testifying witness is a liar. Here, we observe that introduction of Johnson's prior recorded statement did just the opposite—highlighting the inconsistency between the statement she gave before trial and the multiple statements she gave at trial. We find it puzzling why the Commonwealth would seek to offer evidence impeaching the credibility of its own witness, if not to offer that evidence for its substantive purpose, the truth of the matter asserted. Accordingly, the facts before us today do not fit neatly within the non-hearsay classification.

Finally, however, it is clear to this Court that Johnson's prior recorded statement was admissible under the hearsay exception for "inconsistent" statements, and as such was admissible for substantive purposes. KRE 801A(a)(1). Johnson previously told Detective Gibson in her recorded statement that Embry had obtained eight ounces of methamphetamine while in Louisville. At trial, however, she characterized the amount of methamphetamine in Embry's possession as "about six ounces," "like six or eight," and "either six or eight." We observe that the number "eight" is *literally* inconsistent with "about six," "like six or eight," and "either six or eight." We also note that the degree of certainty with which Johnson testified to the amount of methamphetamine she had seen was inconsistent between her statement to Detective Gibson and her trial testimony. "[I]nconsistency is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of

40

position." *Meece v. Commonwealth*, 348 S.W.3d 627, 672 (Ky. 2011) (quoting *United States v. Dennis*, 625 F.2d 782, 795 (8th Cir. 1980)). In her prior recorded statement, when asked whether Embry obtained eight ounces of methamphetamine, Johnson responded soundly in the affirmative. However, at trial, Johnson could not state definitively how much methamphetamine she had seen, going as far as to say herself: "I couldn't be for sure." As such, we conclude once more that Johnson's prior recorded statement was inconsistent with her testimony at trial and admissible.

While we assume the trial court erroneously admitted Johnson's prior recorded statement in reliance on KRE 801A(a)(2), this Court "may affirm a correct result upon any ground supported by the record" even if the lower court "reaches its judgment for the wrong reason." *Wells v. Commonwealth*, 512 S.W.3d 720, 721-22 (Ky. 2017) (citing *Jarvis v. Commonwealth*, 960 S.W.2d 466, 469 (Ky. 1998)).

We also observe that it was undoubtedly error for the trial court to admit the entirety of Johnson's six-minute prior recorded statement, when the only portion at issue was Johnson's brief affirmation to Detective Gibson that she saw Embry obtain eight ounces of methamphetamine. However, we find that any error occasioned by the trial court's decision was invited by defense counsel. During the bench conference immediately preceding admission of Johnson's prior recorded statement, defense counsel advocated that if the trial court admitted any portion of the video, it should admit the entirety of the video. "Generally, a party is estopped from asserting an invited error on

41

appeal." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 37 (Ky. 2011). Accordingly, Embry has waived any objection to the admission of the extraneous footage of Johnson's recorded statement.

### ii. Detective Gibson's statement that Chrystal Johnson provided "reliable" information as a confidential informant

Embry next argues that Detective Gibson's testimony that Chrystal Johnson had produced "reliable" information as an informant amounted to improper "bolstering" of Johnson's credibility as a witness. We find this issue was properly preserved for our review by defense counsel's contemporaneous objection preceding Detective Gibson's statement. Accordingly, we review the trial court's decision to admit Detective Gibson's testimony for an abuse of discretion.

Our rules of evidence mandate that evidence of a witness's truthful character "is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." KRE 608(a). We must first determine whether Johnson's character for truthfulness had been attacked, and then whether Detective Gibson's subsequent statement was actually rehabilitative evidence bearing on Johnson's truthfulness or merely the kind of character evidence prohibited by KRE 404.

We cannot say that the trial court abused its discretion in determining that Johnson's character for truthfulness had previously been attacked. During cross-examination of Chrystal Johnson, the following exchange occurred between Johnson and defense counsel:

42

**Defense Counsel**: "As a user [of drugs] you've lied before, right?

**Chrystal Johnson**: "Yes."

**Defense Counsel**: "Have you lied before to stay out of jail?"

**Chrystal Johnson**: "No."

**Defense Counsel**: "So you've never said 'Hey, that isn't mine officer.' Or anything like that?"

**Chrystal Johnson**: "No."

We observe that while defense counsel did not make a prolonged inquiry into Johnson's character for truthfulness, he did inquire into "specific instances" of lying, presumably to conjure an inference that Johnson had an untruthful character. An inquiry into specific instances of the witness's prior conduct that is "probative of truthfulness" is permissible under KRE 608(b), at the discretion of the trial court, provided "the cross-examiner has a factual basis for the subject matter of his inquiry." KRE 608(b). This brief foray into Johnson's credibility likely did not arouse any explosive conclusions as to Johnson's credibility on the part of the jury, but we cannot say it was not an "attack" on Johnson's credibility for purposes of KRE 608(a). As Professor Lawson notes, "[T]he most common methods of attacking the character of a witness will be by use of evidence of opinion or reputation; however . . . [KRE 608] leaves no doubt that character of a witness may come under attack in other ways." Robert G. Lawson, *Kentucky Evidence Law Handbook* § 4.25[2][a] (2022 ed.)

43

We must now determine whether Detective Gibson's subsequent rehabilitating testimony was evidence of Johnson's character for truthfulness, and thus admissible under KRE 608.

In his brief to this Court, Embry relies heavily on our prior holdings in *Fairrow v. Commonwealth*, to argue that Detective Gibson's statements did not bear on Johnson's character for truthfulness. 175 S.W.3d 601 (Ky. 2005). In *Fairrow*, we held that a police officer's testimony that a *witness* was a "reliable" informant was not probative of the witness's character for credibility and truthfulness, and thus not admissible under KRE 608. *Id.* at 606. This Court characterized the officer's statements as opining on the witness's "dependab[ility]" not credibility or truthfulness. *Id.* We observed that within the context of the officer's testimony, the Commonwealth had specifically inquired as to the witness's previous cooperation with police which included successfully buying drugs from the defendant while acting as an undercover informant. *Id.* Here, we find Detective Gibson's testimony distinguishable in that he opined as to the reliability of the "information" Johnson had provided to him, something we observe bears directly on Johnson's character for truthfulness.

Here, when asked by the Commonwealth whether the *information* Johnson had previously provided to him had proven "reliable," Detective Gibson responded affirmatively. We conclude this testimony was certainly evidence of Johnson's character for truthfulness.

Accordingly, the trial court did not abuse its discretion in admitting Detective Gibson's testimony.

**F. Possession of a Firearm by a Convicted Felon**

Embry next argues that the Commonwealth failed to prove by competent evidence that he was a convicted felon to sustain the conviction for possession of a firearm by a convicted felon. He acknowledges that this alleged error is unpreserved and requests palpable error review.

In order to be found guilty of the crime of possession of a firearm by a convicted felon, the Commonwealth must prove that the defendant does, in fact, have a prior felony conviction. KRS 527.040(1). In this case, to prove this essential element of the crime, the Commonwealth offered into evidence a certified copy of Embry's prior felony conviction from the United States Federal District Court for the Western District of Kentucky, Owensboro Division. This document included a square box in the top left corner which stated, in typewritten words, "**Certified**[,] James J. Vilt Jr., Clerk[,] U.S. District Court[,] W/D of Kentucky[.] Date: Jan 18, 2022[.]" The document did not include a signature of the clerk. This document was admitted through the testimony of the Muhlenberg Circuit Court Clerk who merely testified that the document was a certified copy of a felony conviction from the named federal court and testified to the date it was certified.

Embry argues that the copy of his federal conviction does not comply with KRE 902 or 1005 which govern the admissibility and authentication of certain documents and other records. Specifically, he notes that the document

45

does not contain a signature of the clerk and does not contain a certificate stating that the clerk has the authority to attest to the accuracy of the copy. He further notes that the only seal appears over the name of the judge and appears to be the seal of the court as opposed to the seal of the clerk's office. Review of the relevant rules, however, reveals that these are not requirements for admissibility and authentication when the document is an official record that is kept inside the Commonwealth of Kentucky.

KRE 1005 addresses authentication of public records generally. It states, in relevant part,

> The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed with a governmental agency, either federal, state, county, or municipal, in a place where official records or documents are ordinarily filed, . . . if otherwise admissible, may be proved by copy, certified as correct in accordance with KRE 902 or testified to be correct by a witness who has compared it with the original. . . .

KRE 1005. KRE 902, in turn, allows for an "official record" to "be evidenced by an official publication thereof or by a copy attested by an official having the legal custody of the record." KRE 902(4). Only for records "kept outside of the Commonwealth," is "a certificate that the official attesting to the accuracy of the copy has the authority to do so" required. *Id.* If that certificate is needed, it "may be made by any public officer . . . authenticated by the seal of office." *Id.* However, because the document at issue in this case is not "kept . . . outside of the Commonwealth," those additional requirements do not apply. *Id.* Thus, the copy only needed to be "attested by an official having the legal custody of the record." That requirement was met.

46

As stated, the copy of Embry's federal conviction had a notation in the corner that it was "certified" by the clerk of the United States District Court for the Western District of Kentucky. We acknowledge that the word "attested" does not appear on the document. However, in the past, we have held that "[a] **certified** copy of the Transportation Cabinet's driving history satisfies the authentication requirement of KRE 902." *Commonwealth v. Duncan*, 939 S.W.2d 336, 337 (Ky. 1997) (emphasis added). This interpretation of the attestation requirement in KRE 902(4) is further buttressed by Black's Law Dictionary. Black's definition of "attested copy" merely says, "See certified copy." *Copy*, BLACK'S LAW DICTIONARY (11th ed. 2019). The definition of "certified copy," in turn, states, "A duplicate of an original (usu. official) document, certified as an exact reproduction usu. by the officer responsible for issuing or keeping the original. — Also termed **attested copy**; exemplified copy; verified copy." *Id.* (emphasis added). It is clear to us that a copy of a document that has been "certified" meets the requirement of KRE 902(4) that it be "attested."

Accordingly, the copy of Embry's prior federal conviction was properly authenticated and admitted as proof of his prior felony conviction. The trial court did not err in admitting it.

**G. Cumulative Error**

Embry finally argues that this Court should reverse his convictions on account of cumulative error. We decline to do so.

Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the

47

trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). There is no doubt that error occurred throughout Embry's trial. However, the error we have discerned has lacked any real prejudicial effect. "Although errors crept into this trial, as they inevitably do in a trial . . . they did not, either individually or cumulatively, render the trial unfair." *Id.*

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Muhlenberg Circuit Court.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Lambert and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Bryan Darwin Morrow
Assistant Attorney General

Elizabeth Themins Hedges
Assistant Attorney General